T. C. LANIER ET AL., APPELLANTS, VS. E. J. M. PADGETT ET AL., THE COUNTY COMMISSIONERS OF SUMTER COUNTY, APPELLEES.

1. The County Commissioners have no authority to order an election for the location of a county site under Chapter 1890, Laws of 1872, (McClellan's Digest, 321,) unless a petition is presented to them, signed by one-third of the registered voters of the county, praying for a change of the location of the county site, as required by the first section of the act.

2. Petitions merely asking that an election be held to locate the county site, or to locate the court-house and county offices, and not asking for a change of location of the county site, do not show that they desire a change ; and an election ordered upon such petitions is of no effect to locate or change the county site.

3. Tax-payers may maintain a suit to enjoin the removal of the county offices and county records to any place not legally designated as the county site.

Appeal from the Circuit Court for Sumter county.
The facts of the case are stated in the opinion.

*J. H. Goss* for Appellants.

*Hocker & Mabry* for Appellees.

THE CHIEF-JUSTICE delivered the opinion of the court.

Lanier and others, complainants, are residents and tax-payers in Sumter county, and allege that the county site of that county is, and for a number of years has been, located at Leesburg, where all the county records have been kept, and that complainants and others have invested largely in property at Leesburg by reason of the location of the county site at that place, and that the removal of the county site to another place would have the effect to lessen the value of their property and injure their educational, social and religious interests. They further charge that the County Commissioners, (assuming to act under the authority of an act of the Legislature, approved February 27, 1872,) on the 6th day of June, 1881, ordered that an election for the purpose of locating the county site of that county be held ; and that on the tenth day of October last an election was held to locate such county site, at which election a majority of the votes cast were in favor of the town of Sumterville ; and the defendants intend, on the 15th October, to declare and order that the county site has been, in pursuance of said election, duly changed from Leesburg to Sumterville, and to order the removal of the county records and offices to Sumterville. The said election is alleged to have been illegally held, and is of no legal effect, because the petitions addressed to the board asking an election to be held did not express a desire for a change, nor ask that an election be held to " change the location of the county site," but only prayed that an election be called " to locate the

county site," or "for the purpose of legally locating the court-house," (citing the language of the petitions.)

The bill prays that the defendants be enjoined "from passing or adopting any order declaring the county site changed from Leesburg to Sumterville, or locating the county site at Sumterville, or any order of like purport and effect," until the further order, &c., and for such other relief as may seem proper.

The Chancellor refused the injunction, and complainants appealed.

The title of the act of 1872, under which the alleged election took place, is: "An act allowing the voters of the several counties in this State to locate their respective county sites."

The first section provides that the registered voters of any county wishing to change the location of their county site shall present a petition to the Board of County Commissioners of such county signed by one-third of the registered voters "praying for a change of the location of such county site." By section two the County Commissioners of any county receiving such petition as above specified shall order an election at the several precincts for the location of such county site, giving at least thirty days' notice thereof. Section three provides that the election shall be conducted in the usual manner prescribed by law for holding elections, and the returns of election shall be made to the County Commissioners or to the Clerk. Section four requires the County Commissioners to publicly canvass the returns on the fifth day after the election, and says that " the place receiving a majority of the number of registered voters shall be the county site of said county for ten years," and it is the duty of the County Commissioners to erect county buildings and provide offices for the county officers at the place so selected.

It is plain that in such cases the Board of County Commissioners cannot lawfully call an election for a location of the county site unless a petition is presented to them signed by one-third of the registered voters of the county. And from whom must the petition come? It is equally clear that it must come from registered voters who desire a " change of the location."

Unless such petition is presented the board cannot act, for that is the precise condition prescribed by the law. A petition asking the board to call an election " for the purpose of legally locating the court-house," or " desiring that the question of a county seat be settled so that suitable buildings may be erected for the business of the county," and asking that an election be called for the purpose of locating the county site (as these petitions are variously expressed) do not purport to emanate from or to be signed by voters desiring a " change " of location. For aught that appears in the petitions, none of the signers may have been in favor of a " change," as they merely ask that the question of a county seat may be settled and suitable buildings erected, or the court-house legally located, and that an election be called for these purposes, and every person signing may have been opposed to any change, but merely desired to have a vote which might " settle " the agitation of the question.

It is true that in many instances it may be necessary to consult the title of an act to explain its meaning, but this is not necessary in this case because the first section is clear and explicit, and if we should resort to the title of the act in this case it would give us no warrant to change the positive requirements of the act itself. Indeed the whole scope and purpose of the act is to enable the people to change their county site. The act, therefore, requires that there shall be a petition or petitions signed by those who shall ex-

press a desire for that change in order to give the Commissioners power to order an election.

The bill alleges that there never was any such petition presented, but that the petitions presented were such as are represented. There is no answer to the bill, and we therefore treat the allegations in it as true.

The result is that the election held under the order of the County Commissioners as alleged was not authorized by law, and the result of the election could not effect a change of the location of the county site.

Under the general prayer of the bill that the members of the Board of County Commissioners be enjoined from making any order or doing any act in the direction of effecting a change of the location of the county seat and the removal of the county offices and records by reason of the result of the election, an injunction should have been granted.

The injunction prayed · was not to restrain the members of the board as canvassers of the result of an election, but to restrain them from acting upon the result of an unauthorized election. They would, therefore, be not enjoined from doing what the laws required them to do, but from doing an unlawful act.

Appellee says that the act of 1868 locating the county site at Leesburg is unconstitutional and void. This question can hardly be raised. The question is whether the County Commissioners should act in pursuance of an unauthorized election, and whether Leesburg is the lawful county site is not in issue.

The complainants, simply as tax-payers, in their own behalf and in behalf of other tax-payers, have a standing which entitles them to a remedy against a threatened wrongful proceeding which might involve them and the whole people of the county in great expense and confusion, and jeopardize the titles to property. Adam's Equity, 212; 19 Barb.,

166; 2 Caines, 179; 34 Ind., 119; 5 C. E. Green N. J. Eq., 82; 63 N. C., 147.

The decree refusing an injunction is reversed and the cause remanded, with directions to allow the injunction, and for such further proceedings as may be agreeable to equity and the practice of the court.